IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.N., a Minor, By and Through His Parents Martha and John Niziolek, | : : : | |
| Plaintiff, | : : | CIVIL ACTION |
| v. | : : | NO. 16-6433 |
| UPPER PERKIOMEN SCHOOL DISTRICT, et al., | : : : : | |
| Defendants. | : | |

## MEMORANDUM

**TUCKER, C.J.**                                                                                                                 **January 10, 2017**

      The instant action arises out of Plaintiff's allegations that his free speech rights under the First and Fourteenth Amendments were violated when Defendants disciplined him for his out-of-school social media post. Presently before the Court are Plaintiff A.N.'s Emergency Motion for Preliminary Injunction (Doc. 2), requesting that the Court, among other things, require Defendants to readmit him to school immediately, and Defendants' Response in Opposition thereto (Doc. 9). Upon careful consideration of the parties' submissions and the arguments presented to the Court during the evidentiary hearing held on January 3, 2017, and for the reasons set forth below, Plaintiff's Motion is DENIED.

### I.    FACTUAL BACKGROUND

#### A. The Mash-Up: A.N.'s Speech

      Plaintiff A.N. is a 15-year-old student who attends school in the Upper Perkiomen School District ("School District"). (Pl.'s Mot. ¶ 4.) Defendants are the School District, Dr. Alexis McGloin, the School District Superintendent, Dr. Sean Arney, the School District Assistant Superintendent, and Dr. Robert Carpenter, the Upper Perkiomen High School Principal.

Defendants seek to expel A.N. for his mash-up[1] video of *Evan*[2] and *Pumped Up Kicks*,[3] posted on Instagram, a social networking website. (Pl.'s Mot. ¶ 5.)

*Evan* is a video distributed by Sandy Hook Promise, a nonprofit organization led by family members of victims of the Sandy Hook Elementary School shooting. The video is a public service announcement about recognizing the potential warning signs of teen gun violence. The nearly two-and-a-half-minute video seemingly follows the story of a teen boy, Evan, and a teen girl, who carve missives to each other on a library desk. Halfway through the video, a group of high school students are seen signing yearbooks in a gymnasium. There, the couple discover each other's identity because the teen girl recognizes Evan's handwriting after he signs another student's yearbook with the message, "See you next year Evan." Officially meeting for the first time, Evan and the teen girl chuckle and converse while a silhouetted student in the background appears in the doorway.

The student in the background drops a duffel bag and cocks a semiautomatic rifle. The students in the gymnasium scream and run. The video fades to black. The video then plays back the story of Evan and the teen girl, but this time refocuses the viewer on the silhouetted student who had been in the background throughout the story. This playback highlights the overlooked potential signs of school violence.

*Pumped Up Kicks* is a song by the group, Foster the People, that describes a young man's homicidal thoughts. The lyrics to the song include:

> All the other kids with the pumped up kicks
> You'd better run, better run, out run my gun

---

[1] A "mash-up" is "something created by combining elements from two or more sources." MERRIAM-WEBSTER (Jan. 3, 2017), https://www.merriam-webster.com/dictionary/mash%E2%80%93up.
[2] Sandy Hook Promise, *Evan*, YOUTUBE (Dec. 2, 2016), https://www.youtube.com/watch?v=A8syQeFtBKc.
[3] fosterthepeopleVEVO, *Foster The People - Pumped up Kicks*, YOUTUBE (Feb. 11, 2011), https://www.youtube.com/watch?v=SDTZ7iX4vTQ.

> All the other kids with the pumped up kicks
> You'd better run, better run, faster than my bullet
> All the other kids with the pumped up kicks
> You'd better run, better run, out run my gun
> All the other kids with the pumped up kicks
> You'd better run, better run, faster than my bullet

(Prelim. Inj. Hr'g Defs.' Ex. 3.)

    A.N.'s mash-up involved only a portion of *Evan*, starting at the scene in which the students were in the gymnasium signing yearbooks. (Prelim. Inj. Hr'g Tr. 28:2–28:14.) A.N. then overlaid the song *Pumped Up Kicks* to the clip where the screen faded to black after the silhouetted student entered the gymnasium and readied his semiautomatic rifle. *Id.* Plaintiff alleges that his mash-up contained no specific reference to any Upper Perkiomen school, nor did it contain any specifically threatening language. (Pl.'s Mot. ¶ 6.) Plaintiff contends that he created the mash-up because the signs of a school shooter were not "compelling evidence," and he believed that the original video deserved ridicule. (Prelim. Inj. Hr'g Tr. 26:16–27:5.)

### B. A.N.'s Post on a Private Social Media Page

    According to Plaintiff, he and two of his friends created a private account on Instagram and named the account "upperperkiscool." (Prelim. Inj. Hr'g Tr. 20:11–21:11.) Plaintiff characterized the account as a "vigilante" group to "make fun" of others. (Prelim. Inj. Hr'g Tr. 22:22–23:12.) He did not use his real name and used an unknown child's photograph as his profile picture because he wanted his posts from the private Instagram page to remain anonymous. (Prelim. Inj. Hr'g Tr. 24:23–25:7.) The followers of the private Instagram group were predominately School District students. (Defs.' Mem. 3.)

    On December 4, 2016, at approximately 8:00 p.m., A.N. used his personal device and his family's private home network to post the mash-up anonymously on the upperperkiscool

Instagram page. (Pl.'s Mot. ¶ 7; Defs.' Resp. ¶ 6.) Plaintiff captioned the mash-up, "See you next year, if you're still alive."[4] (Defs.' Resp. ¶ 5.)

### 1. A.N.'s Post: Viewers' Initial Reactions

After posting the mash-up and the caption, other users, mostly School District students, expressed concerns that the video was a threat. (Pl.'s Mot. ¶ 8.) Two School District students commented directly on the post. (Prelim. Inj. Hr'g Defs.' Ex. 4.) One of the students also privately messaged A.N. with concerns and asked whether A.N.'s post was a "legit school shooting threat." (Defs.' Mem. Ex. A.) A.N. responded under the post that the video was not a threat before eventually removing the video post from Instagram. (Pl.'s Mot. ¶ 8.) The video was on Instagram for less than two hours, but was viewed 45 times. (*Id.*) A.N. testified that prior to deleting the post on Instagram, he had already deleted the mash-up video completely from the device on which he created it.[5] (Prelim. Inj. Hr'g Tr. 60:3–60:10; 61:18–25.)

S.N., a parent of another School District student, saw the video and emailed Defendant Dr. Carpenter. (Prelim. Inj. Hr'g Defs.' Ex. 6.) In her email, S.N. noted that the post was alarming, and that it was edited to say, "see you next year. it [sic] is not a threat, you n*@#& need to chill." (*Id.*) S.N. testified at the evidentiary hearing that she emailed Dr. Carpenter because she, and the students, did not know how to interpret the post. (Prelim. Inj. Hr'g Tr. 106:1–106:7.)

J.M., a parent of another School District student, testified that her child showed her a screenshot of the post that read, "see you tomorrow." J.M. said the screenshot of the post was "alarming" and that she called the Pennsylvania State Police after viewing the screenshot at

---

[4] Plaintiff claims that the caption was wordplay on what the student wrote in the yearbook in *Evan*. (Prelim. Inj. Hr'g Tr. 28:20–29:2.)
[5] A.N. testified that as a common practice for maintaining anonymity, he routinely deleted any record of anything he posted on the upperperkiscool Instagram page.

around 8:30 p.m. (Prelim. Inj. Hr'g Tr. 112:12–113:19.) She testified that the state police arrived at her house at around midnight. J.M.'s child showed the state police a separate screenshot of A.N.'s post, which read "see you next year if you are still alive." (Prelim. Inj. Hr'g Tr. 115:25–118:7.)

### 2. A.N.'s Post: School District's Reactions

A state police officer called Dr. Carpenter and left a voicemail at around 2:00 a.m. concerning a report that a threat had been made against the School District on an anonymous Instagram account. (Defs.' Mot. ¶ 9.) Within minutes, Dr. Carpenter returned the officer's call, and the officer sent Dr. Carpenter a screenshot of the Instagram account. (Prelim. Inj. Hr'g Tr. 122:1–124:19.) Dr. Carpenter then notified Defendant Dr. McGloin. (Defs.' Mem. 3.) During this time, Dr. Carpenter discovered S.N.'s email in his email account. Dr. Carpenter and others used their database to identify the student in the upperperkiscool profile picture.

They wrongly identified another student.

Dr. McGloin testified that the police were unable to secure a warrant for the Instagram account because it was too early in the morning. (Prelim. Inj. Hr'g Tr. 142:24–143:20.) She also testified that it was impossible to determine whether the threat was real because the poster was anonymous and she could not identify the student in the picture. (Prelim. Inj. Hr'g Tr. 145:17–146:3.) In the early morning of December 5, 2016, Dr. McGloin made the final decision to close the School District. This decision was made after consulting with Dr. Carpenter, working through the night with law enforcement, considering the investigating officer's opinion, reviewing the police report, and remaining unable to identify the source of the "threat" and "potential targets." (Prelim. Inj. Hr'g Tr. 144:2–25; Defs.' Mem. 3.) Upon cancelling classes in

5

the School District, Dr. McGloin also cancelled all public school buses, and messaged all schools and parents of School District students. (Prelim. Inj. Hr'g Tr. 145:1–16.)

### 3. A.N.'s Response to the Disorder

At around 6:30 a.m., on December 5, 2016, A.N. emailed Dr. McGloin. (Pl.'s Mot. ¶ 10; Defs.' Resp. Ex. B.) In his email, A.N. acknowledged that the "issue at hand" that contributed to the cancellation of school was serious. (Defs.' Resp. Ex. B.) A.N. also noted that the people that viewed the video "became reasonably scared." (*Id.*) A.N. did not identify himself as the creator of the post or one of the administrators of the account, nor did he reassure Dr. McGloin that the post was not a threat.[6] (*Id.*) A.N. also testified that he intentionally mislead Dr. McGloin in his email. (Prelim. Inj. Hr'g Tr. 51:13–20.) Dr. McGloin forwarded A.N.'s email to the police. (Prelim. Inj. Hr'g Tr. 147:3–13.)

On December 6, 2016, Pennsylvania State Police visited A.N.'s home to investigate the situation. (Pl.'s Mot. ¶ 11.) A.N. and his parents willingly surrendered A.N.'s personal phone and computer to the police for forensic examination. (*Id.*) However, the police did not search Plaintiff's items. (Prelim. Inj. Hr'g Tr. 93:9–15.) The investigating police concluded that Plaintiff's actions did not satisfy the elements of the crime of terroristic threats and closed its criminal case against Plaintiff. (Prelim. Inj. Hr'g Tr. 93:16–94:9.)

### C. The School District's Disciplinary Action

As a result of this incident, the School District suspended A.N. for his conduct and now seeks to expel him. (Pl.'s Mot. ¶ 12.) A.N. has been out of school since December 5, 2016, and cannot enter school grounds or attend any school function without the administration's

---

[6] Plaintiff asserts in his Motion that his email "explicitly stated that the video was not a threat to commit school violence," and that he further informed Dr. McGloin that, "like the creators of his source material, he wanted to further the conversation on -- not encourage -- mass shootings." (Pl.'s Mot. ¶ 10.) This assertion is false. (Defs.' Resp. Ex. B.)

6

permission. (*Id.* ¶ 13.) Prior to this incident, A.N. had never been disciplined in school. (Prelim. Inj. Hr'g Tr. 19:17–20.)

## II.     PROCEDURAL BACKGROUND

On December 15, 2016, A.N., by and through his parents, filed a Complaint in this Court and sued the School District under 42 U.S.C. §§ 1983 and 1988, asserting that the School District's discipline of A.N. for his conduct violated his right to free speech as guaranteed by the First and Fourteenth Amendments. That same day, Plaintiff filed an Emergency Motion for Preliminary Injunction requesting that the Court direct Defendants to allow A.N. to return to school immediately, discontinue A.N.'s suspension, and prohibit the School District from pursuing a formal expulsion hearing. (*Id.* ¶ 16.) On December 29, 2016, Defendants replied to Plaintiff's Motion. (Doc. 9.)

On January 3, 2017, the Court held an evidentiary hearing. Plaintiff's counsel called A.N., A.N.'s father, John Niziolek, and police officer Brendan Shearn as witnesses; Defendants' counsel called S.N. and J.M., parents of School District students, Dr. Carpenter, and Dr. McGloin as witnesses.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 authorizes courts to issue preliminary injunctions. Fed. R. Civ. P. 65(a). Injunctive relief is "an extraordinary remedy and should be granted only in limited circumstances." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 318 (3d Cir. 2015) (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir.1994) (internal quotation marks omitted)). To prevail on a preliminary injunction motion, the movant bears the burden of establishing that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm, (3) he would be more injured

than the defendant if relief is denied, and (4) an injunction is in the public interest. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).

## IV.   DISCUSSION

Plaintiff moves for injunctive relief. Plaintiff contends that injunctive relief is proper because he has satisfied all elements of the preliminary injunction test, including demonstrating that he will likely succeed on the merits of the underlying claim because: (1) A.N.'s off-campus speech was expressive conduct that an objectively reasonable person could not perceive as a true threat, (2) no one could reasonably believe that A.N.'s speech would cause a substantial disruption to the school environment, and (3) Defendants' decision to close the School District was not caused by A.N.'s speech. (Pl.'s Mem. 6–8.) Ostensibly, Plaintiff argues that A.N.'s speech was protected speech under *Tinker*.

Defendants argue that Plaintiff has failed to establish a likelihood of success on the merits of the underlying claim because Plaintiff's speech, under *Tinker*, is not entitled to First Amendment protection. Therefore, the School District did not exceed its authority or violate Plaintiff's free speech rights when it disciplined Plaintiff for his Instagram post. (Defs.' Mem. 7, 10.)

Before the Court is whether Plaintiff is likely to succeed on the merits of his underlying claim, which is the first element of the preliminary injunction test. Plaintiff's underlying Complaint asserts that Defendants violated A.N.'s free speech rights when Defendants disciplined Plaintiff for posting his mash-up on social media, which was created off campus. In

deciding whether Plaintiff is likely to succeed on the merits of his underlying claim, the Court must consider whether, under *Tinker*, A.N. has met his burden of demonstrating that his off-campus speech is entitled to First Amendment protection.

The Court finds that Plaintiff has not.

### A.  Framework for Evaluating Students' First Amendment Claims

The First Amendment protects speech "in matters of adult public discourse." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). However, the Supreme Court has held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.* (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340–42 (1985)). While a student's First Amendment rights are not completely shed at school, a student's ability to exercise his rights in school must be considered "in light of the special characteristics of the school environment." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926 (3d Cir. 2011) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)) (internal quotation marks omitted). It is unclear whether a student's in-school speech should be analyzed in the same manner as a student's out-of-school speech.

#### 1.  *Tinker* Standard Applied to In-School Speech

A student's in-school speech[7] may be analyzed using the substantial disruption test set forth in *Tinker*.[8] *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 106 (3d Cir. 2013). Under *Tinker*, schools may restrict speech that "would materially and substantially

---

[7] *Tinker* does not apply where a student's in-school speech: (1) is lewd, vulgar, and plainly offensive, (2) is school-sponsored, or (3) advocates for illegal drug use. *See Fraser*, 478 U.S. 675; *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Morse v. Frederick*, 551 U.S. 393 (2007). A.N.'s speech does not fall into any of these categories.

[8] *Tinker* involved high school students who were suspended for wearing black armbands protesting the Vietnam War, after school officials created a policy that prohibited students from wearing armbands. The students sued, claiming a violation of their First Amendment rights, and the Supreme Court agreed. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

interfere with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509 (internal citation omitted). A student's conduct, "*in class or out of it*, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves a substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513 (emphasis added). Also, a student's speech is not protected if it "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.* at 514. The disruption must be "a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Snyder*, 650 F.3d at 926 (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001)) (internal quotation marks omitted). Essentially, *Tinker* protects a student's expressive speech that: (1) does not actually cause a disruption in the school environment or (2) lead school officials to reasonably forecast a substantial disruption of or material interference with school activities. *Tinker*, 393 U.S. at 513–514.

### 2. *Tinker* Standard Applied to Out-of-School Speech

The Supreme Court has never directly applied *Tinker* to a student's off-campus speech. *Burge ex rel. Burge v. Colton Sch. Dist. 53*, 100 F. Supp. 3d 1057, 1062 (D. Or. 2015). However, most Circuit Courts have.[9] In *Snyder*, the Third Circuit assumed, without deciding, that *Tinker*

---

[9] *See generally Doniger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008) (holding that plaintiff did not show a likelihood of success on the merits of her free speech claim because student's vulgar internet post from home created a foreseeable risk of substantial disruption); *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565 (4th Cir. 2011) (holding that the school's discipline of student for creating and posting on a social media page from home that ridiculed another student was proper under *Tinker*); *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379 (5th Cir. 2015) (holding that the school's discipline of student for a rap that was created off campus containing language threatening two school teachers was proper under *Tinker*); *D.J.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754 (8th Cir. 2011) (holding that the school's discipline of student for instant messages created on his home computer containing threats was proper under *Tinker*); *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062 (9th Cir. 2013) (holding that school's discipline of student for sending threatening instant messages from home about planning a school shooting was proper under *Tinker*).

applied to a student's off-campus speech. 650 F.3d at 926. The Court ruled that the First Amendment prohibits a public school from punishing a student for off-campus speech that does not cause an actual disruption to the school environment, or could reasonably lead school officials to forecast a substantial disruption at school. *Id.* at 920.

### B. Applying *Tinker* to A.N.'s Speech

Following the Third Circuit in *Snyder*, this Court will assume that *Tinker* applies to off-campus speech. *Tinker's* substantial disruption test is a fact-intensive inquiry. Here, the Court must determine, based on the facts, whether Plaintiff is likely to prevail on the merits of his underlying claim that the School District violated A.N.'s right to free speech. Plaintiff will fail on the merits if the School District demonstrates that A.N.'s off-campus speech was not protected speech. Therefore, Plaintiff is unlikely to prevail on the merits of his First Amendment claim, and injunctive relief is inappropriate, if A.N.'s speech materially disrupted the school environment or reasonably led the School District to forecast that a substantial disruption would occur.

In applying *Tinker* to this case, the parties dispute the extent to which A.N.'s Instagram post caused a disruption or had the potential to cause a substantial disruption to the school environment. A.N. does not dispute that a disruption occurred; only that it was not his speech that caused the disruption. Instead, he claims that it was the mischaracterization of his speech caused the disruption. (Pl.'s Mem. 8.) However, the facts in this case support the conclusion that it was A.N.'s speech that caused the disruption to the school environment, or at the very least, the School District's reactions were reasonable considering the totality of the circumstances.

### 1. A.N.'s Post Actually Caused a Disruption

The cases relied upon by Plaintiff, *Snyder*[10] and *Layshock*,[11] are only similar to the case before the Court in that they deal with school officials' regulation of a student's off-campus speech on social media. However, Plaintiff's reliance on *Snyder* and *Layshock* are misplaced because here, unlike in *Snyder* and *Layshock*, an actual disruption occurred.

In *Snyder*, the Third Circuit, applying *Tinker*, held that it was unreasonable for the school to believe that a student's off-campus speech would cause a substantial disruption to the school because the speech was so nonsensical that "*no one could have taken it seriously, and no one did.*" *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,* 650 F.3d 915, 930–31 (3d Cir. 2011) (emphasis added). However, the Court did not address whether the student's speech actually caused a substantial disruption because the issue was not before the Court. *Id.* at 928.

In *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, the Third Circuit emphasized that the issue before it was not whether the student's conduct caused a disruption to the school environment, so it did not apply *Tinker* when it found that a student's off-campus speech was protected. 650 F.3d 205, 207 (3d Cir. 2011).

Unlike the students in *Snyder* and *Layshock*, it is clear that A.N.'s speech caused an actual disruption to the school environment. Students, parents, and school officials reacted. Police became involved. An innocent child and his family were awoken in the middle of the night by the police out of concern that he posted the threat. Additionally, the morning after the post, the School District was closed, buses in the school district were cancelled, and school district officials messaged all schools and parents of School District students.

---

[10] *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 930–31 (3d Cir. 2011).
[11] *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 207 (3d Cir. 2011).

At minimum, A.N.'s speech was the mash-up video that he created and posted on Instagram depicting the violent portion of *Evan* overlaid with the threatening song lyrics contained in *Pumped Up Kicks*, captioned, "See you next year, if you're still alive." After viewing A.N.'s post, two students immediately inquired about whether A.N.'s post was a threat. Additionally, a parent of a School District student sent an email to the school's principal to notify him of the post because the parent did not know "how to interpret" it. Separately, a parent who saw a screenshot of A.N.'s post called the state police, who, after reviewing a screenshot of A.N.'s post, notified the school's principal. As a result of A.N.'s speech, school officials belabored in the wee hours of the morning to determine the identity of the poster and discern whether the perceived threat was credible. There is no doubt that A.N.'s mash-up video posted on Instagram is the speech that caused a disruption.

Unlike in *Snyder* where the Third Circuit stated that no one could or did take the content of the student's nonsensical social media profile seriously, people could, and in fact, did, take the content of A.N.'s post seriously. A.N.'s classmates asked whether the post was real and a parent who viewed the post emailed the school's principal. Another parent contacted the state police about the post. After being unable to discern whether to take the post seriously, the School District's superintendent was left with no other choice than to close schools after consulting with state police.

While A.N. attempts to argue that others mischaracterized his speech, the facts do not support such a conclusion. Any "mischaracterizations" arose after the perceived threat existed and stemmed from A.N.'s choices pertaining to the mash-up, including posting the video from an anonymous account, using a profile picture of an unknown child, posting on an Instagram page directed at School District students.

A.N.'s post created a substantial disruption to the school environment; therefore, the School District's discipline did not violate A.N.'s First Amendment rights. Accordingly, A.N. has not met his burden of establishing the first element of the preliminary injunction test.

### 2. A.N.'s Post Reasonably Led Defendants to Forecast a Substantial Disruption of, or a Material Interference to, the School Environment

Even if a disruption did not occur, which the Court finds that it did, the School District's reactions and discipline did not violate A.N.'s First Amendment rights because A.N.'s post reasonably led school officials to "forecast substantial disruption of or a material interference with school activities." *Tinker*, 393 U.S. at 514. Dr. McGloin was forced to cancel school for the safety and well-being of the School District's students because there was a perceived threat against the School District that neither she, nor the police could confirm was legitimate. Considering the recent history of school shootings across the nation, it was not unreasonable for Dr. McGloin to close the School District.[12]

In *R.L. v. Cent. York Sch.*, the Middle District of Pennsylvania recently held that school officials did not violate a student's First Amendment rights when school officials suspended a student for creating a social media post outside of school that read: "Plot twist, bomb isn't found and goes off tomorrow." 183 F. Supp. 3d 625, 629–30 (M.D. Pa. 2016). Applying *Tinker*, the court found that the student's speech actually caused a disruption and that it was reasonable for school officials to forecast a substantial disruption to the school environment due to the student's social media post. *Id.* at 636, 640. The court noted that if a school can "point to a well-founded expectation of disruption . . . the restriction may pass constitutional muster." *Id.* (quoting *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013)) (internal quotation marks

---

[12] In fact, a fatal school shooting occurred in the School District before. *See* Joseph McDermott, *Upper Perkiomen Sophomore Shot to Death in Classroom Teen Tells Police Taunts Led to Plan to Kill Classmate*, THE MORNING CALL (May 25, 1993), http://articles.mcall.com/1993-05-25/news/2916043_1_michael-swann-upper-perkiomen-high-school-jason-michael-smith.

14

omitted). The court determined that school officials' actions were reasonable because school officials "*clearly viewed* [the student's] post as an issue of school safety." *Id.* (emphasis added). The court stated that "in light of the many school shootings that tragically occurred over the past few decades, there can be no doubt that schools, parents and students must take *any suggestion* of a bomb threat very seriously and with great concern." *Id.* at 637 (emphasis added).

Although the student argued that the post was meant to be a joke, the student's subjective intent was not relevant to the court's application of *Tinker*. The *Tinker* standard also did not require the court to decide whether school officials' characterization of the student's speech as a threat was proper. *Id.* The court noted that its finding was consistent with similar cases in other circuits. *Id.* (discussing *Wisniewski v. Bd. of Ed. Of Weedsport Cen. Sch. Dist.*, 494 F.3d 34 (2d Cir. 2007) (holding, under *Tinker*, that it was reasonably foreseeable that a student's speech would cause a disruption to the school environment where a student's internet message suggested that a teacher would be killed, even after a police investigator and psychologist concluded that the student's speech was intended as a joke)).

Similar to the school officials in *R.L.*, it was reasonable for the School District to forecast a substantial disruption to the school environment due to A.N.'s post. A.N. asserts that School District officials never actually saw his post, and the decision to close the School District was not caused by A.N.'s speech. It is of no consequence that school officials never saw A.N.'s post directly. In fact, there was no way for school officials to see the actual post, even after the fact, because A.N. deleted the post and the video from all sources in order to maintain his anonymity.

School officials, and investigating police, clearly viewed A.N.'s post as a school safety issue. Dr. McGloin made a prudent and time-sensitive decision to close the district after working late into the early morning and consulting with police. Considering the totality of the

15

circumstances, and the facts as outlined above, Dr. McGloin and the School District officials' fear of disruption was significant and not remote because, at the very least, there was a suggestion of a school threat from an unknown source over the internet in a forum consisting predominately of Upper Perkiomen school district students.

Furthermore, although A.N. contends that his post was not a threat and was only intended to ridicule *Evan*, A.N.'s intent behind his post is not relevant in applying *Tinker*.

A.N.'s post reasonably led school officials to forecast that a substantial disruption to the school environment would occur. As such, the School District's discipline did not violate A.N.'s First Amendment rights. Accordingly, A.N. has not met his burden of establishing the first element of the preliminary injunction test, and the Court need not consider the other elements.[13]

## V.   CONCLUSION

For the reasons set forth herein, the Court denies Plaintiff A.N.'s Emergency Motion for Preliminary Injunction. An appropriate order follows.

---

[13] Since Plaintiff is unlikely to prevail on the merits of his claim and his speech is considered unprotected under *Tinker*, the public interest weighs against the imposition of a preliminary injunction. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). In this case, granting a preliminary injunction would hamper the School District's ability to protect the safety of its students and likely encourage unprotected student speech that causes a disruption to the school environment. Accordingly, Plaintiff has not met his burden of demonstrating that the public would be served in a granting an injunction. In fact, denying the injunction will further the public interest in maintaining safety and preventing disruptions to the school environment.